

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern Di·· : f Texas
Fi·

APR 2 9 2004

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| DINO X. CHAVEZ, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. B-04-042 |
| | § | |
| AMERICAN FAMILY LIFE | § | |
| ASSURANCE COMPANY OF COLUMBUS, | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT AFLAC'S MOTION AND BRIEF TO STAY PROCEEDINGS AND TO COMPEL ARBITRATION

**TO THE HONORABLE JUDGE OF SAID COURT:**

Defendant American Family Life Assurance Company of Columbus ("AFLAC") files this Motion and Brief to Stay Proceedings and to Compel Arbitration and respectfully shows as follows:

### I. SUMMARY OF ARGUMENT

The present dispute arises out of the termination of Plaintiff Dino X. Chavez's ("Chavez") Regional Sales Coordinator's Agreement with AFLAC. As a result of that termination, Chavez has brought this suit against AFLAC. Chavez, however, agreed to arbitrate any dispute arising under his agreement with AFLAC. Because of that agreement to arbitrate, his lawsuit must be stayed, and Chavez must be compelled to proceed to arbitration.

### II. BACKGROUND FACTS

A.    <u>Chavez Agrees to Arbitrate All Controversies with AFLAC.</u>

AFLAC, headquartered in Columbus, Georgia, sells insurance products throughout the country. In 1994, Chavez entered into a contract to serve as an independent sales associate for

AFLAC, when he started selling AFLAC's policies in and around the Brownsville, Texas area. A true and correct copy of Chavez's Associate's Agreement with AFLAC is attached hereto as Exhibit 1. In Paragraph Fifteen, Chavez agrees that *"[a]ny dispute* arising under this Agreement, *to the maximum extent allowed by applicable law*, shall be subject to arbitration, and prior to commencing any court action, the parties agree that they *shall arbitrate all controversies*." (emphasis added)

Chavez worked his way up the ladder of AFLAC's independent sales force. In 1998, Chavez accepted the position of Regional Sales Coordinator ("RSC"), wherein he would coordinate the efforts of several AFLAC Associates. A true and correct copy of his RSC Agreement is attached hereto as Exhibit 2. In Paragraph Seven of his RSC Agreement, Chavez agrees that all provisions of his Associate's Agreement, including his agreement to arbitrate, would continue "to be of full force and effect", and he ratifies and reaffirms all of those terms as if set forth *verbatim* in his RSC Agreement.

B.    Chavez Handles the BISD Account for AFLAC.

In 1998, Brownsville Independent School District ("BISD") agreed to use AFLAC to coordinate BISD's Section 125 Cafeteria Plan. A Cafeteria Plan allows employees, through payroll deductions, to use pre-tax dollars to purchase supplemental health insurance, dental insurance, pay for childcare, and the like. Employers typically allow their employees to enroll in the employer's Cafeteria Plan once each year. By coordinating the employee enrollment in a Cafeteria Plan, AFLAC agents have the opportunity to sell AFLAC's supplemental insurance products to the employees.

Beginning in 1998, AFLAC made Chavez its agent in charge of handling the enrollment of the BISD account for AFLAC. As a result, Chavez and his team of AFLAC sales agents sold

AFLAC policies to BISD employees, earning commissions and override commissions for Chavez. Chavez also coordinated BISD's Cafeteria Plan enrollment in 1999 and again in 2000.

C.     Chavez Accuses BISD of Illegal Conduct, and BISD Kicks Chavez Off Campus.

In the early fall of 2001, BISD again solicited requests for qualifications to administer its Cafeteria Plan. As before, AFLAC submitted a proposal, naming Chavez as the contact person for AFLAC. During the course of the selection process, Chavez began to question BISD's actions, particularly those of some of the members of the school board, in relation to the selection process. Unbeknownst to AFLAC, Chavez began a letter-writing campaign and spoke at school board meetings to voice his concerns, going so far as to suggest that BISD was acting illegally in the manner it was selecting a Cafeteria Plan administrator.

Chavez's remarks did not sit well with BISD's Superintendent of Schools Noe Sauceda ("Sauceda"). In November of 2001, AFLAC received a copy of a letter sent by Sauceda to Chavez, referring to Chavez's allegedly unprofessional and unethical conduct, banning Chavez from any BISD campus, and stating that AFLAC's proposal to coordinate BISD's Section 125 Cafeteria Plan had been rejected.

Ultimately, BISD agreed to reconsider AFLAC's proposal, provided that AFLAC appointed another agent to service the BISD account. AFLAC sent another representative to present its proposal to the school board and, once again, was granted the Cafeteria Plan servicing rights. AFLAC assigned another AFLAC agent to coordinate that year's Cafeteria Plan enrollment at BISD.

D.     AFLAC Terminates Chavez's RSC Agreement.

Chavez opposed being replaced on the BISD account. He demanded from AFLAC that the BISD account remain his. Chavez even went so far as to have his lawyer send a threatening

letter to BISD and each of its board members, demanding that they rescind their directive prohibiting Chavez from handling the BISD employees' Cafeteria Plan. Thereafter, AFLAC informed Chavez that it was exercising its contractual right to terminate his RSC Agreement at will and without cause, as was its right under their agreement. The termination took effect on January 27, 2002. Although AFLAC terminated Chavez's RSC Agreement, Chavez remains an independent insurance agent authorized to sell AFLAC products.

### III. PROCEDURAL BACKGROUND

A.    Chavez Sues BISD and Sauceda.

Chavez did not sue AFLAC right away. Instead, Chavez sued BISD and Sauceda. He alleged a variety of claims, including allegations that they violated his constitutional right to free speech and due process, invoking 42 U.S.C. § 1983.[1]

BISD later brought AFLAC into that suit as a third-party defendant, seeking contribution or indemnity. AFLAC moved to dismiss BISD's third-party claims and later moved for summary judgment on much the same grounds, arguing that there was no legal basis for contribution or indemnity. AFLAC eventually was granted summary judgment. In granting summary judgment, the court (1) noted that BISD conceded it had no right to contribution under Section 1983, and (2) acknowledged that any other possible claim Chavez had against AFLAC sounded in contract, not tort. Because contribution is tort-based, and because no tort was alleged by Chavez for which AFLAC could be a joint tortfeasor, contribution would not lie.[2]

Long before the Court granted summary judgment to AFLAC, but while AFLAC's motion to dismiss was pending, Chavez filed a "Notice of Clarification of Claims". In his

---

[1] The case is styled *Chavez v. Brownsville Independent School District, et al*, Civil Action No. B-02-128, in the U.S. District Court for the Southern District of Texas, Brownsville Division. Chavez also sued three BISD school board members, all of whom were later dropped from his suit. The court in *Chavez v. BISD* eventually granted BISD's and Sauceda's Motions for Summary Judgment. Chavez has appealed.

[2] A copy of the Court's opinion granting summary judgment to AFLAC is attached hereto as Exhibit 3.

"clarification"—a document that defies categorization—Chavez stated that, although he had not filed a claim against AFLAC in any forum, he nonetheless possessed a claim for race discrimination against AFLAC under 42 U.S.C. § 1981.

The race discrimination "claim" was news to AFLAC, who had received no demand letter from Chavez, was not aware of any proceeding before the EEOC, and generally had never heard Chavez complain that he was mistreated due to his Hispanic origin. Nevertheless, Chavez argued that, based on this newly-minted and supposedly unasserted claim, he did indeed have a tort claim that he *could have* asserted against AFLAC (but mysteriously chose not to assert), so there did exist a basis on which to hold that AFLAC was a joint tortfeasor and, as a joint-tortfeasor, AFLAC should remain as a third-party defendant to BISD's contribution claim.

The court did not buy it. As was apparent to the court—and to all the parties—Chavez wanted to avoid arbitration. Chavez agreed to arbitrate any claim he had against AFLAC. But, BISD had no agreement to arbitrate with AFLAC. So, by his "clarification", Chavez hoped to keep AFLAC tangled up in his lawsuit against BISD through BISD's third-party contribution claim and thereby avoid having a direct claim against AFLAC, which would be sent to arbitration. Chavez's plot was foiled, however, when the court granted AFLAC's motion for summary judgment.

B.    Chavez Files His "Stealth" Lawsuit Against AFLAC in State Court.

Unbeknownst to the court or to AFLAC, BISD or Sauceda, Chavez had, in fact, filed a discrimination claim against AFLAC. He filed suit in state court in the summer of 2003, alleging a claim against AFLAC under 42 U.S.C. § 1981 for discrimination. Chavez did not issue citation or serve it, however. In fact, he told none of the parties that he filed it, even though he

represented to the court in his suit against BISD that he had an unasserted discrimination claim against AFLAC.  It is the same suit that was removed to this Court.

C.     <u>AFLAC Removes Chavez's Lawsuit</u>.

When he filed his "stealth" suit, Chavez did not ask the state-court clerk to issue citation. Nor did Chavez send a copy of his petition to AFLAC.  Chavez waited until *after* the court granted AFLAC summary judgment in Chavez's suit against BISD and Sauceda before taking any action in his "stealth" suit.  Chavez had citation issued in his state court suit against AFLAC on February 3, 2004, and obtained service on AFLAC on February 12, 2004.[3]  AFLAC answered in state court, asserting its right to arbitration, and then removed Chavez's suit to this Court on March 2, within thirty days of service.

D.     <u>AFLAC Tries Unsuccessfully to Settle with Chavez</u>.

After removal, AFLAC initiated settlement talks with Chavez through their respective counsel, but those settlement efforts have failed.  Accordingly, AFLAC has demanded that Chavez arbitrate this dispute.[4]  Chavez, in reply, has asserted that his agreement to arbitrate is not enforceable.[5]  No discovery has been conducted nor any other action taken by either party in this federal court proceeding.  AFLAC now moves this Court to compel Chavez to arbitrate and to stay these proceedings.

## IV.  ARGUMENTS AND AUTHORITIES

A.     <u>Chavez's Claims Should Be Arbitrated, Not Litigated</u>.

Clear state and federal precedent establishes that there is only one issue before this Court: whether an arbitration agreement exists that covers the present dispute.  Upon determining that

---

[3] See state-court docket sheet, Exhibit D to Defendant AFLAC's Notice of Removal filed herein on March 2, 2004, and copy of Citation, Exhibit B to Notice of Removal.
[4] See letter to Chavez's counsel dated April 15, 2004, attached hereto as Exhibit 4.
[5] See letter from Chavez's counsel dated April 19, 2004, attached hereto as Exhibit 5.

such an agreement does exist, this Court has a non-discretionary obligation under both state and federal law to compel arbitration. Accordingly, AFLAC respectfully submits that this case should be stayed, and Chavez should be directed to arbitration.

1.      **The parties have a valid and enforceable arbitration agreement.**

The parties have entered into a valid and enforceable agreement to arbitrate under both the Federal Arbitration Act (the "Federal Act") and the Texas General Arbitration Act (the "Texas Act").

a.      *The Arbitration Agreement is enforceable under the Texas Arbitration Act.* The Texas Act provides that "[a] written agreement to arbitrate is valid and enforceable if the agreement is to arbitrate a controversy that . . . arises between the parties after the date of the agreement." Tex. Civ. Prac. & Rem. Code § 171.001 (Vernon Supp. 2001). To be entitled to arbitration, the defendant must establish that: (1) a valid, enforceable arbitration agreement exists; and (2) that the claims asserted fall within the scope of the agreement. *Brown v. Anderson*, 102 S.W.3d 245, 248 (Tex. App.—Beaumont 2003, pet. denied). Here, the dispute arose in 2001, after Chavez signed his written agreement to arbitrate in 1994 and reaffirmed that agreement in 1998. Hence, the agreement also falls within the application of the Texas Act.

b.      *The Arbitration Agreement is also enforceable under the Federal Arbitration Act because it involves interstate commerce.* The Federal Act applies to all contracts "evidencing a transaction involving interstate commerce." 9 U.S.C. § 2 (1970). This case falls within the purview of the Federal Act because the agreement involves interstate commerce. Chavez resides in Texas. AFLAC is headquartered in Columbus, Georgia and sells its insurance products throughout the United States. Chavez has solicited AFLAC customers for AFLAC in the State of Texas. As with all of AFLAC's sales associates, Chavez submits applications for insurance

coverage to AFLAC's home office in Georgia, where they are processed and underwritten. AFLAC then issues the policy from Georgia and sends it to the insured in Texas.   The commissions Chavez receives for any policies sold are issued and paid out of Georgia to Chavez in Texas either by U.S. mail or by direct deposit transfer over the telecommunications system to his bank account.  Further, any claims that are made by insureds on policies sold by Chavez are also submitted by Chavez to AFLAC's office in Georgia for processing.  AFLAC then pays benefits to the insureds in Texas from its home office in Georgia, typically by use of the U.S. mail.

Clearly, the agreement involves interstate commerce and, thus, the Federal Act also applies to the parties' arbitration agreement. *See also, In re L&L Kempwood Associates, L.P.*, 9 S.W.3d 125 (Tex. 1999) (renovation by a Texas construction company of a Houston apartment complex owned by a Georgia partnership found to be a transaction involving interstate commerce).  The arbitration provision itself states that arbitration shall be conducted under the Federal Act.  (Exhibit 1, ¶ 15(b).)  Where an arbitration agreement references the Federal Act, the Federal Act prevails over the Texas Act. *EZ Pawn Corp. v. Mancias*, 934 S.W.2d 87, 91 (Tex. 1996).  Moreover, where the parties have agreed that a dispute is to be governed by the Federal Act, they are not required to show that the transaction at issue involves or affects interstate commerce. *In re Kellog Brown & Root*, 80 S.W.3d 611, 617 (Tex. App.—Houston [1st Dist.] 2002, orig. proceeding).  In this case, AFLAC has shown both that Chavez's agreement involves interstate commerce and that Chavez agreed to arbitrate under the Federal Act. Therefore, the Federal Act applies to disputes arising under Chavez's Agreement.

2.    **There Is a Strong Public Policy Favoring Arbitration.**

The Federal Act provides that an arbitration clause "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  The purpose of the Federal Act is to "reverse the longstanding judicial hostility to arbitration agreements . . . and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991).

Guided by the Federal Act's animating purpose, the Supreme Court has repeatedly held that arbitration agreements are to be read liberally to effect their purpose.  *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 (1983); *see also Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 90 (2000); *Mastrobuono v. Shearson Lehman Hutton*, 514 U.S. 52, 63 (1995); *Gilmer*, 500 U.S. at 24.  As the Supreme Court held in *Mastrobuono*, when a court interprets an arbitration provision, "due regard must be given to federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause must be resolved in favor of arbitration." *Mastrobuono*, 514 U.S. at 62.  Indeed, arbitration should not be denied "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960); *see also Pennzoil Exploration & Production Co v. Ramco Energy Ltd.*, 139 F.3d 1061, 1067 (5th Cir. 1998); *Dallas Cardiology Associates v. Mallick*, 978 S.W.2d 209, 212 (Tex. App.—Texarkana 1998, pet. denied)(applying Texas Act).

Under the Federal Act, an arbitration agreement is presumed to be "valid … and enforceable." *See Shearson/American Express v. McMahon*, 482 U.S. 220, 226 (1987) (quoting 9 U.S.C. § 2); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626-27 (1985).  In determining whether a dispute falls within the scope of an agreement to arbitrate,

Texas and Federal courts alike recognize the strong public policy favoring arbitration. *Moses H. Cone Memorial Hospital v. Mercury Construction Corp*, 460 U.S.1, 24-25 (1983); *Prudential Securities, Inc. v. Marshall*, 909 S.W.2d 896, 898 (Tex. 1995).

3.    **The Parties' Arbitration Agreement Is Broad in Scope.**

In deciding whether a dispute falls within the scope of an arbitration agreement, a court is not bound by labels given to the claims of the plaintiff and instead should "focus on the factual allegations of the complaint, rather than the legal causes of action asserted." *Grigson v. Creative Argists Agency*, 210 F.3d 524, 526 (5th Cir. 2000). The Fifth Circuit has held that language in an arbitration provision must be read expansively, and "reach[es] all aspects of the relationship" between the parties. *Nauru Phosphate Royalties, Inc. v. Drago Daic Interests, Inc.*, 138 F.3d 160, 165 (5th Cir. 1998); *see also Pennzoil Expl.*, 139 F.3d at 1067 (broad arbitration clauses, which use language such as "arise under," "in connection with," or "relating to," reach "all disputes between the parties having a significant relationship to the contract...."). *See also Sweet Dreams Unlimited, Inc. v. Dial-a-Mattress Int'l, Ltd.*, 1 F.3d 639, 642 (7th Cir. 1993) ("'[A]rising out of' reaches all disputes having their origin or genesis in the contract, whether or not they implicate interpretation or performance of the contract per se."); *Becker Autoradio U.S.A., Inc. v. Becker Autoradiowerk GmbH*, 585 F.2d 39, 44 (3d Cir. 1978) (arbitration agreement including phrase "arising out of and about" encompasses matters that "ar[ise] in the course of and during the on-going relationship ... created and governed . . ." by the contract containing the arbitration provision). With a broad arbitration provision such as this one, the dispute need not arise out of, but must simply "touch" the matters covered by the underlying agreement. *Mitsubishi Motors Corp.*, 473 U.S. at 624 N.13; *Hou-Scape, Inc. v. Lloyd*, 945 S.W.2d 202, 205 (Tex. App.—Houston [1st Dist.] 1997, no pet.).

It is well settled that a party resisting arbitration bears the burden of showing that the arbitration provision does not encompass the claims at issue, or that the clause is invalid. *Green Tree*, 531 U.S. at 92. Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. *Prudential Securities*, 909 S.W.2d at 899; *Moses H. Cone*, 460 U.S. at 25. The Supreme Court has held that in "the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim for arbitration can prevail." *ATT Technologies, Inc. v. Communication Workers of America*, 475 U.S. 643, 650 (1986).

Arbitration proceedings are not limited to resolution of contract claims. If a statutory or tort cause of action is found to be "inextricably enmeshed" or "factually intertwined" with facts underlining the arbitration agreement, it, too, is properly submitted to arbitration. *Hou-Scape, Inc. v. Lloyd*, 945 S.W.2d at 205; *Valero Energy Corp. v. Wagner and Brown, II*, 777 S.W.2d 564, 566 (Tex. App.—El Paso 1989, writ denied); *see also Grigson*, 210 F.3d at 526 (compelling arbitration of a tortious interference with contract claim against a non-signatory to the contract where the plaintiff's claims were inextricably intertwined with the contract). "The test should be based on a determination of whether a particular tort claim is so interwoven with the contract that it could not stand alone or, on the other hand, is a tort completely independent of the contract and could be maintained without reference to the contract." *Valero Energy Corp.*, 777 S.W.2d at 566.

The scope of Chavez's arbitration agreement is quite broad: "*[a]ny dispute* arising under [the Regional Sales Coordinator's and/or Associate's] Agreement, *to the maximum extent allowed by applicable law, and* . . . the parties agree that they shall arbitrate *all controversies*." (Associate's Agreement, Exhibit 1 ¶ 15 (emphasis added).) Accordingly, it encompasses not

only Chavez's breach of contract claim but also (i) his Section 1981 claim that his RSC Agreement was terminated because he is Hispanic and (ii) his claim of intentional infliction of emotional distress. His discrimination claim "touches" the agreement. For, the gravamen of a Section 1981 claim is alleged discrimination in the enforcement *of a contract*. But for the contract, there could have been no relationship out of which the alleged discrimination could have occurred. Similarly, but for the termination of the RSC Agreement, there could have been no alleged infliction of emotional distress. For, as Chavez states in his complaint, "Defendant's actions were also in breach of its contract with Chavez and constituted an intentional infliction of emotional distress." Plaintiff's First Amended Original Petition, at p. 4. According to Chavez, the actions constituting breach also caused his emotional distress. Both claims refer to the RSC Agreement and are therefore within the scope of the arbitration agreement.

As a review of the factual allegations in his amended petition shows, Plaintiff's entire suit is based upon AFLAC's decision to terminate his RSC Agreement. Had there been no termination, there would be no suit. Thus, Chavez's dispute, whatever the labels given or causes of action asserted, arises under his agreement with AFLAC and, hence, is arbitrable.

B.      Movant Is Entitled to Recover Its Attorneys' Fees.

As noted above, AFLAC has notified Chavez that his claims are subject to arbitration. Nonetheless, Chavez has refused to arbitrate and has stated his intent to pursue his claims in this Court against AFLAC, forcing AFLAC to move to compel arbitration. Under the provisions of Paragraph Eleven of his Associate's Agreement, which provides for the recovery of attorneys' fees, as well as the dictates of Section 38.001 of the Texas Civil Practice and Remedies Code, AFLAC is entitled to recover its attorneys' fees in having to enforce the parties' agreement to arbitrate. AFLAC submits that a reasonable fee for such effort is $2,500.

## CONCLUSION

For the foregoing reasons, AFLAC asks that the Court grant its motion to stay these proceedings and order Chavez to proceed with arbitration immediately. Further, AFLAC prays for recovery of $2,500 in attorneys' fees incurred in the enforcement of the parties' agreement to arbitrate.

Respectfully submitted,

By: _William B. Steele III by_
William B. Steele III
State Bar No. 19107400
Southern Dist. No. 8019
LOCKE LIDDELL & SAPP LLP
100 Congress, Suite 300
Austin, Texas 78701
512-305-4700
512-305-4800 (fax)

**ATTORNEYS FOR AMERICAN FAMILY LIFE
ASSURANCE COMPANY OF COLUMBUS**

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing was served via first class U.S. mail, on this 28th day of April, 2004, upon counsel of record as follows:

J. Arnold Aguilar
Artemis Square, Suite H-2
1200 Central Boulevard
Brownsville, Texas 78520

_William B. Steele III by_
William B. Steele III

## CERTIFICATE OF CONFERENCE

I hereby certify that the undersigned counsel for defendant AFLAC attempted to confer with Arnold Aguilar, counsel for plaintiff Dino Chavez, on April 28th, about the relief requested by this Motion.  Mr. Aguilar is out of town and unable to confer with me about this Motion, therefore, I am unable to represent whether Mr. Aguilar will oppose the Motion.

William B. Steele III

## **VERIFICATION**

THE STATE OF GEORGIA     §
                                §

COUNTY OF MUSCOGEE     §

BEFORE ME, the undersigned Notary Public, on this day personally appeared Jefferson W. Willis, a Vice President of AFLAC, defendant in the above-styled and numbered cause, who upon his oath, deposed and stated that he reviewed the Motion and Brief to Stay Proceedings and to Compel Arbitration; that he has made reasonable investigation of information available to him; and that based on his investigation of facts known to him, the statements of fact contained in Sections II.A (regarding Chavez's agreement to arbitrate) and IV.A.1.b. (regarding interstate commerce) are true and correct.

_____
Jefferson W. Willis

SWORN TO AND SUBSCRIBED before me on this 27 day of April, 2004.

_____
Notary Public, State of Georgia
Comm. Exp. 7/14/05

# American Family Life Assurance Company
## of Columbus (AFLAC)
### Worldwide Headquarters: Columbus, Georgia 31999

## *Associate's Agreement*

American Family Life Assurance Company of Columbus, a Georgia corporation (hereinafter "AFLAC"), and the undersigned person (hereinafter "Associate") agree as follows:

### PARAGRAPH ONE: Authority of Associate

(a) **Independent Contractor.** The relationship of Associate to AFLAC shall be that of an independent contractor, rather than employee and employer, and nothing contained herein shall be construed as creating any other relationship.

(b) **Unauthorized Acts.** Associate is not authorized to make any contract or incur any debt in the name of AFLAC, nor shall Associate modify or amend any application for insurance or any policy of insurance, interpret or construe policy language, extend the time for making any payment which may become due on any policy, nor waive any of AFLAC's rights or privileges under its policies or applications.

(c) **No Implied Authority.** Associate shall have no authority other than that expressly granted herein, and no forbearance or neglect on the part of AFLAC shall be construed as a waiver of any of the terms of this Agreement or imply the existence of any authority not expressly granted herein.

### PARAGRAPH TWO: Duties of Associate

(a) **Procure and Maintain Licenses.** Associate shall be responsible for procuring and maintaining any resident license, non-resident license and appointment, if applicable, that any State may require for soliciting applications for insurance policies offered for sale by AFLAC. Associate shall also be responsible for renewing and maintaining any such license(s) or appointment(s). This Agreement is contingent upon the issuance and maintenance of valid license(s) or appointment(s) to sell insurance by the Insurance Department of the State of Associate's residence, and of the State from which Associate may have a non-resident license or appointment, if any.

(b) **Solicit Applications.** Associate shall solicit applications for insurance policies offered for sale by AFLAC within the states where Associate is duly licensed to solicit such insurance applications. Associate is free to exercise Associate's own judgment as to time and place of solicitation.

(c) **Service Accounts.** Associate shall service all payroll deduction accounts ("accounts") that Associate initially sells or that are assigned to the Associate by AFLAC. Associate agrees that the first-year and renewal commissions paid to Associate in accordance with the terms herein constitute full payment for soliciting the application that resulted in the insurance policy being issued, and the performance of all other duties by Associate. AFLAC reserves the absolute right to reassign any account for servicing and to designate who may solicit applications from persons in the account in its sole discretion. Upon such reassignment, Associate shall continue to be paid renewal commissions on policies which Associate sold to persons in the account prior to reassignment, provided Associate is otherwise entitled to commissions in accordance with this Agreement. However, Associate will not be paid commissions on policies which are sold to persons in the account by another associate after the account has been reassigned by AFLAC.

(d) **Other Duties.** Associate shall use only promotional material which is furnished to Associate by AFLAC or which has been approved in writing from a Vice President of AFLAC. Associate shall pay all expenses incurred by Associate in the sale and service of insurance policies offered by AFLAC. Any administrative service fees which any group or franchise account may charge for handling premium payroll deduction shall be considered an expense of the Associate. Any such expenses which AFLAC advances on Associate's behalf shall be a debt to AFLAC and shall be reimbursed by deducting them from the commissions which become due to Associate. Associate shall carefully evaluate all applications for insurance and make full and accurate disclosure to AFLAC of all material facts and circumstances which might affect the underwriting of the risk, and shall promptly forward all applications for insurance policies to AFLAC at its Worldwide Headquarters in Columbus, Georgia. Associate shall additionally collect the initial premium that may be due on applications and promptly remit the same to AFLAC along with applications, Associate shall promptly deliver policies and claim documentation sent to the Associate.

(e) **Return Policies and Monies.** Associate shall return to AFLAC on demand all undelivered policies, premium receipts, negotiable papers, or monies due AFLAC and all documents or other property belonging to AFLAC. Associate agrees to be responsible for all monies collected by Associate under the terms of this Agreement.

### PARAGRAPH THREE: Confidential Information;
### Ownership of Accounts, Records and Confidential Information

Associate agrees that the following information, to-wit: 1) payroll deduction account information, 2) names and addresses of all AFLAC policyholders, associates and coordinators, 3) account or premium invoices, 4) payroll account servicing documents,

Exhibit No. 1    AFL 2923

5) claimant data, including payment sheets or letters, 6) training and educational manuals, 7) administrative manuals, 8) policy expiration data, and 9) prospective policyholder leads developed by AFLAC and furnished to associates and/or coordinators (e.g., "lead cards"), in whatever form, whether computer or electronically accessible, "on-line," or not, are confidential information and, as such, are information competitively antageous to AFLAC, and Associates have no property right, vested interest or ownership interest in said confidential information. Associate hereby agrees that all accounts and records, including but not limited to the confidential information above referred to, are and shall remain the property of AFLAC exclusively, both before and after the termination of this Agreement, and the Associate shall have no property rights therein. Associate further covenants to make no copies, in whatever form, if any of said records nor any part of them, and that none of them, in any form, is to be removed from the custody of Associate, except in the performance of duties hereunder. Associate further agrees to return to AFLAC all such accounts, records and confidential information at the termination of this Agreement or upon demand, whichever first occurs.

## PARAGRAPH FOUR: Duties and Rights of AFLAC

(a) **Duties.**

(1) **Provide Sales Materials.** AFLAC shall provide Associate with standard promotional and informational material to be used in the sale and service of insurance policies offered by AFLAC. All such materials and information shall remain the property of AFLAC and shall be promptly returned upon demand or upon the termination of this Agreement.

(2) **Underwrite Policies.** AFLAC shall consider each application submitted by Associate and approve or reject the same. If approved, a policy of insurance shall be issued to the applicant in accordance with the amount and type of insurance for which application was made. All underwriting decisions are to be made solely by AFLAC and it reserves its right to prescribe rules regarding the requirements for eligibility of applicants for insurance.

(3) **Pay Commissions.** On policies issued upon applications submitted by Associate and as full compensation for Associate's services, sales commission will be paid as follows:

(i) **First-Year Commissions.** So long as Associate is authorized to represent AFLAC, a first-year sales commission may be advanced by AFLAC on premiums earned in accordance with the terms of the applicable Schedule of Commissions. No first-year sales commissions will be paid to Associate after Associate's termination, unless Associate is otherwise entitled to payment of renewal commissions. AFLAC shall have the right to apply all or part of the first-year sales commissions or registration fees to Associate's indebtedness to AFLAC. AFLAC may charge a registration fee at the time of sale which will be credited to Associate's monthly accounting statement. AFLAC may charge policyholders a policy processing fee. Associate shall not be entitled to any commission based upon such a policy processing fee.

(ii) **Renewal Commissions.** A renewal commission is defined as that commission which is paid on premiums as earned by AFLAC on an insurance policy previously produced by Associate, commencing with the thirteenth (13th) month's premium and such renewal commission shall be based on an amount not greater than the annualized premium amount applicable at the time a policy is initially issued. A renewal commission as provided by the Schedule of Commissions will be paid as earned pursuant to the terms and subject to the conditions of Paragraphs 5, 6 and 8 of this Agreement.

(4) **Provide Monthly Statements.** AFLAC shall, provided Associate is entitled to receive commissions hereunder, furnish Associate with a monthly accounting statement. Upon the receipt of such statement, Associate agrees to notify AFLAC within thirty (30) days in writing of any mistakes or discrepancies in the statement. Failure of Associate to so notify AFLAC shall constitute acceptance of AFLAC's statement as rendered, and Associate waives all rights to any claims against AFLAC to the contrary, and such claims shall be forever barred.

(b) **Rights.** With respect to the foregoing duties, AFLAC shall have the following rights:

(1) **Assignment to Coordinator.** AFLAC may assign Associate to a sales coordinator for purposes of assisting Associate in training and marketing. Associate may be reassigned to a different sales coordinator in AFLAC's discretion. It is expressly understood and agreed that AFLAC can function only through its agents, and its decisions through its officers, agents and sales coordinators, and other associates, shall be deemed to be made in the due course, and within the scope, of managing the business of AFLAC. For any mistake, neglect, abuse of discretion, or other action taken, not amounting to willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise a presumption of conscious indifference to consequences, in making and enforcing AFLAC's decisions relating to Associate and Associate's performance of the duties under this Agreement, liability, if any, of AFLAC and liability, if any, of its officers, agents, sales coordinators and other associates, individually, if any, each and all, for damages shall be limited to a claim for breach of contract, and Associate's sole remedy shall be for breach of contract, and damages shall be assessed accordingly.

(2) **Advancement of Commissions.** AFLAC shall have the right to advance commissions to Associate. Any sums advanced to Associate shall create a liability to AFLAC on the part of Associate, and shall be payable on demand without notice, and shall create a liability to AFLAC and any amounts, indebtedness or liability owed to AFLAC by Associate may be charged back and offset against all amounts credited or to be credited to Associate's account. First-year sales commissions shall be credited to Associate on a pro rata basis as the entire first year's premium becomes earned by AFLAC. AFLAC shall have the right to apply all or part of the first year's sales commission or renewal commissions to Associate's indebtedness to AFLAC.

(3) **Service Charge.** AFLAC may charge one-half of one percent interest per month on any outstanding negative balance on Associate's monthly statement. AFLAC may also charge a COD penalty fee for issuing policies where the initial premium is not paid in full as set out on the applicable Schedule of Commissions.

(4) **Notice to Insurance Commissioner or Other Regulatory Authorities of Certain Information, Absolutely Privileged.** Upon receipt of, or discovery of, information by AFLAC which reasonably brings in question the validity of Associate's license or appointment, or which suggests fraudulent or criminal activity on the part of Associate, AFLAC shall have the right to give notice of said information to the Insurance Commissioner or other regulatory authority involved, and to give notice of same to Associate, and shall further have the right to terminate Associate's authority to represent AFLAC immediately, pending determination of the question involved, and all said notices shall be absolutely privileged. Associate specifically and expressly

AFL 2924

authorizes the release of said information to the Commissioner or other regulatory authority, and AFLAC shall have no liability for so doing.

(c) **Schedules of, and Provisions Governing Commissions** (Hereafter Schedule of Commissions). All commissions shall be paid in accordance with the terms of the applicable Schedules of Commissions published by AFLAC. Associate acknowledges receipt of the current applicable Schedules of Commissions at the time of the execution of this Agreement. Said schedules are incorporated herein by reference and are a part of this Agreement. AFLAC may change the terms of said schedules, but any change in commissions shall not affect those commissions due or to become due to Associate on policies issued which had an effective date prior to the date of the change. When changes in the schedules are made they are incorporated herein by reference and become a part of this Agreement. AFLAC shall furnish Associate written notice of any change in the schedules at least thirty (30) days prior to the effective date of such change.

## PARAGRAPH FIVE: Contingent Payment of Renewal Commissions
### Prior to Termination of this Agreement

Prior to termination, AFLAC's obligation to pay renewal commissions (as defined herein) shall be contingent upon Associate's faithful performance or observance of his or her obligations and covenants hereunder, and Associate shall be entitled to be paid renewal commissions prior to termination ONLY under conditions as follows:

(a) **Monthly Production.** In order to receive renewal commissions on premiums from policies produced by Associate, Associate must produce during that month $750 in annualized premium on new policies issued by AFLAC. To be produced, the policies sold by Associate must be properly and timely submitted to the AFLAC Headquarters for processing and must be accepted by the AFLAC Headquarters in accordance with Headquarters underwriting procedures.

(b) **Temporary Disability.** If Associate is temporarily disabled to the extent of not being able to meet the monthly production requirements for renewal commissions, AFLAC shall pay such renewal commissions as earned for a period of up to three (3) months during which the disability continues subject to AFLAC's determination that Associate was and is disabled, provided that, and as a condition precedent thereto, Associate shall notify AFLAC in writing of Associate's disability within sixty (60) days from the date of the onset of the disability. Any claim for renewal commissions not in compliance with this paragraph shall be waived.

(c) **Permanent Disability.** After two (2) years of service with AFLAC, if Associate becomes totally disabled while still active with AFLAC, Associate shall have a vested right to receive all renewal commissions on policies Associate produced for as long as Associate remains totally disabled. Associate shall be totally disabled only if Associate meets the disability requirements of the Social Security Act; provided that, and as a condition precedent thereto, Associate shall notify AFLAC within sixty (60) days in writing after he or she becomes totally disabled. Any claim for renewal commissions not in compliance with this paragraph shall be waived. Renewal commission payments made pursuant to the provisions of subparagraph (b) or (c) are not disability benefits, and the Associate may incur taxes thereon.

(d) **Annual Production.** Upon the production by Associate of at least $10,000 of annualized premium on all new policies issued by AFLAC during a calendar year, Associate shall be entitled to receive renewal commissions on premium payments received by AFLAC for the remainder of that year and for the following calendar year on the in-force policies produced by Associate, as long as a minimum of ),000 in annualized premium on new policy sales used to qualify for this provision remains in force during that year and the following calendar year. If the annualized premium on new policy sales used to qualify for this provision subsequently falls below $10,000, then the means of qualification provided herein shall be suspended.

(e) **Vesting After 10 Years.** After ten (10) years of service with AFLAC, Associate shall have a vested right to receive 100% of the renewal commissions as earned payable on policies Associate produced, irrespective of the production requirements of subparagraphs (a) and (d) above, until termination of this Agreement or unless forfeited as provided in this Agreement.

(f) **Conditions to Payment of, and Right to Receive, Renewal Commissions.** Associate shall be entitled to receive renewal commissions payable under the terms of this Agreement unless Associate who is otherwise entitled to receive renewal commissions engages in any of the conduct prohibited under Paragraph Eight, or should Associate engage in conduct in the performance of Associate's duties and covenants hereunder involving moral turpitude, dishonesty, fraud, deceit, willful misrepresentation, or willful concealment of material facts. Should Associate who is otherwise entitled to receive renewal commissions engage in any such conduct, then, and in such event, the renewal commissions which would otherwise be payable to Associate hereunder shall immediately and automatically become non-payable, and Associate forever forfeits any right to receive the payment of any renewal commissions as provided under this Agreement.

## PARAGRAPH SIX: Contingent Payment of Renewal Commissions
### At and After Termination of this Agreement

Upon the effective date of termination and after termination of this Agreement, AFLAC's obligation to pay renewal commissions (as defined herein) shall be contingent upon Associate's faithful performance or observance of his or her obligations and covenants hereunder, and Associate shall be entitled to be paid renewal commissions at and after termination ONLY under conditions as follows:

(a) **Vesting After Two Years.** After two (2) years of service with AFLAC, Associate, upon termination, shall have a vested right to receive 50% of the renewal commissions as earned payable on policies Associate produced so long as a minimum of $25,000 in annualized premium on policies written by Associate remains in force, for life, unless forfeited as hereinafter provided.

(b) **Vesting After Five Years.** After five (5) years of service with AFLAC, Associate, upon termination, shall have a vested right to receive 75% of the renewal commissions as earned payable on policies the Associate produced, for life, unless forfeited as hereinafter provided.

(c) **Vesting After 10 Years.** After ten (10) years of service with AFLAC, Associate shall have a vested right to receive 100% of the renewal commissions as earned payable on policies the Associate produced, for life, unless forfeited as hereinafter provided.

(d) **Death.** If the Associate dies while receiving renewal commissions, effective with policies issued January 1, 1994 and after, one-hundred percent (100%) of the renewal commissions to which Associate would have been entitled to receive at or after termination shall be payable as follows:

(1) **Surviving Spouse.** To Associate's surviving spouse solely during the surviving spouse's lifetime.

(2) **Surviving Children.** If no spouse survives and there is a surviving child or children of the deceased Associate under the age of

Form A-13510-94

AFL 2925

twenty-three (23) years, to such child or children under twenty-three (23) until the youngest child reaches the age of twenty-three (23) years. If Associate's spouse survives Associate, but dies before all of Associate's children reach the age of twenty-three (23), to such child or children under twenty-three (23) until the youngest child reaches the age of twenty-three (23). Renewal commissions shall be paid only to the child's legally appointed guardian unless such child has reached the age of majority in his or her state of residence. No renewal commissions are payable to any child or children who are twenty-three (23) or older. Children under the age of twenty-three (23) shall share equally.

(3) **No Surviving Spouse or Children.** If no spouse survives and there are no surviving children of the deceased Associate under the age of twenty-three (23) years, to the Associate's estate for a period equal to the number of months of the Associate's service with AFLAC, not to exceed thirty-six (36) months.

(e) **Conditions to Payment of, and Right to Receive, Renewal Commissions.** Associate shall be entitled to receive renewal commissions payable under the terms of this Agreement unless forfeited in accordance with Paragraph 5(f) above.

## PARAGRAPH SEVEN: Limited Assignment of Benefits

Associate may not assign to a third party any right to receive renewal commissions which Associate has under this Agreement during Associate's lifetime without AFLAC's prior written consent; provided, however, Associate may assign and surrender all rights to renewal commissions, without the approval of anyone, to AFLAC for such valuable consideration as mutually agreed upon by Associate and AFLAC. Further, Associate may pledge and assign any rights Associate may have to renewal commissions to AFLAC to secure the repayment of any loan or indebtedness which Associate may owe to AFLAC. Further, Associate grants to AFLAC a security interest against, and AFLAC reserves a lien upon, all of Associate's rights to receive first-year commissions and renewal commissions to secure the payment of any indebtedness which Associate may owe AFLAC. Any assignment by Associate to a third party shall be subject to the provisions of this paragraph, and shall always be subject to AFLAC's prior right of offset and its prior security interest.

## PARAGRAPH EIGHT: Prohibited Conduct

(a) During the term of this Agreement, Associate shall not (1) engage in any conduct in the performance of Associate's duties and covenants hereunder involving moral turpitude, dishonesty, fraud, deceit, willful misrepresentation or willful concealment of a material fact; (2) wrongfully misappropriate or withhold any funds, policies, premiums, receipts, vouchers or other property belonging to AFLAC or to an applicant for insurance; (3) violate any insurance laws or regulations of any state, the violation of which involves moral turpitude; or (4) make or knowingly allow to be made any false or misleading statements on any applications or claim or other documents submitted to AFLAC.

(b) During the term of this Agreement and for a period of two (2) years after its termination, Associate covenants that, within a 100-mile radius of his or her business address, as shown at the end of this Agreement (except Subparagraph 8(b)(3) herein which is not subject to any territorial limitation), **Associate shall not, directly or indirectly:**

(1) Induce or attempt to induce other associates or sales agents or coordinators of AFLAC who reside within the 100-mile radius to terminate their agreements with AFLAC, or to become contracted or associated with another insurance or indemnity company which engages in the sale of insurance policies which directly competes with the policies then sold by AFLAC; or

(2) Induce or attempt to induce policyholders or accounts of AFLAC located within a 100-mile radius of Associate's address, which Associate solicited, sold or serviced while this Agreement was in effect, to relinquish, cancel or surrender their policies or accounts, provided this shall not prohibit a direct unsolicited contact of the Associate by the policyholder and a subsequent sale based on such unsolicited contact; or

(3) Divulge, use or make available to anyone other than those within AFLAC authorized to receive such information, payroll deduction account information, names and addresses of any AFLAC policyholders, associates and coordinators, account or premium invoices, payroll account servicing documents, claimant data, including payment sheets or letters, training and educational manuals, administrative manuals, policy expiration data and prospective policyholder leads developed by AFLAC and furnished to associates and/or coordinators (e.g., "lead cards"), in whatever form, whether computer or electronically accessible, "on-line," or not, all of which is agreed to constitute confidential information and information competitively advantageous to AFLAC.

(4) The foregoing covenants shall not apply in the event AFLAC, its successor or assigns, ceases to do business as an insurer, or ceases to do such business within the applicable territory involved.

(c) Associate shall not change his business address for purposes of this Agreement without the prior consent of the company and the execution of a new Associate's Agreement specifying his new business address. In the event of such change, the territorial limitation herein specified shall continue to apply to Associate for a period of one year next subsequent to the change, at which time it shall automatically self-destruct and cease to exist. During such one-year period, the covenants herein contained relating to a territorial limitation shall apply not only to the preceding business address, but also to the new business address specified in the succeeding Associate's Agreement.

(d) **Provisions of Covenants Are Reasonable and Necessary.** Associate recognizes that AFLAC has a valid need to protect its interests by prohibiting Associate from engaging in any of the activities described in this paragraph. Associate acknowledges and agrees that the time period and the geographic area are reasonable and necessary to protect AFLAC's business, and that the prohibited activities are described with reasonable certainty, and are understood by Associate.

(e) **Forfeiture of First-Year and Renewal Commissions Upon Breach.** Should Associate engage in any of the conduct described in this paragraph, the first-year commissions and renewal commissions which would otherwise be payable to Associate or Associate's survivors shall immediately and automatically become non-payable, and Associate forever forfeits any and all rights to be paid any commissions from AFLAC.

## PARAGRAPH NINE: Termination of Agreement

(a) **Termination for Cause.** AFLAC shall have the right to terminate this Agreement immediately, and the termination shall be considered as being for cause, if Associate engages in any of the following:

(1) Wrongfully misappropriates or withholds any funds, policies, premium receipts, vouchers or other property belonging to AFLAC or to an applicant for insurance; or

(2) Violates any insurance laws or regulations of any state, the violation of which would result in the revocation of Associate's license; or

(3) Pleads guilty or nolo contendere to, or is convicted of, a crime (whether felony or misdemeanor) involving moral turpitude; or

4

(4) Makes or knowingly allows to be made any false or misleading statements on any application or claim or other document submitted to AFLAC; or

(5) Engages in any of the prohibited conduct in Paragraph Eight; or

(6) Associate ceases to hold a valid license to sell insurance policies offered by AFLAC.

(b) **Termination by Notice Without Cause.** Either party may terminate this Agreement at will, without cause, upon giving thirty (30) days prior written notice to the other party.

(c) **Termination Upon Death or Permanent Disability of Associate.** This Agreement shall terminate upon the death or total disability of Associate, unless sooner terminated.

## PARAGRAPH TEN: Treatment of Associate and Associate's Responsibilities Under Federal Tax Laws

Associate shall be treated as an independent contractor and not as an employee as concerns all applicable tax laws with respect to services performed under this Agreement, and Associate is hereby advised as an independent contractor that Associate must report all sales commissions to the Internal Revenue Service on the appropriate income tax form and pay any federal income taxes due with respect to these amounts. Additionally, Associate must report all sales commissions on the appropriate self-employment tax form and pay any self-employment ("S.E.C.A.") taxes with respect to these amounts. To assist Associate in complying with these requirements, AFLAC will, after the close of each calendar year, furnish Associate with a copy of the Form 1099 Income Statement that AFLAC is also required to send to the Internal Revenue Service.

## PARAGRAPH ELEVEN: Legal Proceedings, Attorneys' Fees and Litigation Expenses

(a) **Legal Proceedings.** The Associate shall not institute legal proceedings in the name of AFLAC against any party for any cause unless such action shall have been approved in advance in writing by a Vice President of AFLAC. Should a claim be brought by a third party against either the Associate or AFLAC as a result of some alleged action by the Associate, the Associate shall hold AFLAC harmless from and indemnify it for any attorneys' fees and court costs which it may incur in defending the claim and for any damages which it suffers either through settlement of the claim or by judgment being rendered against it. In the event AFLAC shall invoke its rights under this paragraph, AFLAC shall notify Associate in writing of its intent. AFLAC shall have the right to apply all or any part of Associate's first-year and/or renewal commissions toward the damages caused to it hereunder. AFLAC may, in its sole discretion, determine whether to defend or settle any such claim, and the amount of any such settlement.

(b) **Attorneys' Fees and Litigation Expenses.** Should AFLAC institute legal action against Associate to recover for indebtedness of Associate to AFLAC, Associate covenants to pay AFLAC the reasonable attorneys' fees and litigation expenses which AFLAC may incur, in addition to principal, interest and damages.

## PARAGRAPH TWELVE: Prior Contracts Superseded

This Agreement supersedes and replaces all previous contracts between the parties, but all rights accrued up to the date of execution of this Agreement shall not be affected or impaired, except as modified by this Agreement. For policies issued prior to January 1, 1994, renewal commissions at death will be paid in accordance with the Associate's preceding Agreement.

## PARAGRAPH THIRTEEN: Modifications

This Agreement may not be orally modified. No modification is binding upon AFLAC unless it is in writing and signed at its Headquarters by its President, a Vice President, or its Secretary, for a substantial valuable consideration other than the performance of services by Associate, except as expressly provided in this Agreement.

## PARAGRAPH FOURTEEN: Severability

If any one or more of the provisions, words or phrases contained in the paragraphs and subparagraphs of this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable, such invalidity, illegality or unenforceability shall not affect any other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provisions, words or phrases were not contained herein.

## PARAGRAPH FIFTEEN: Arbitration

(a) Any dispute arising under this Agreement, to the maximum extent allowed by applicable law, shall be subject to arbitration, and prior to commencing any court action the parties agree that they shall arbitrate all controversies.

(b) **Procedure.** The arbitration shall be pursuant to the terms of the Federal Arbitration Act. The parties shall notify each other of the existence of an arbitrable controversy by certified mail and shall attempt in good faith to resolve their differences within fifteen (15) days after the receipt of such notice. Notice to Associate shall be sent to Associate's address as it appears in AFLAC records and notice to AFLAC shall be sent to: Arbitration Officer, American Family Life Assurance Company of Columbus (AFLAC), Worldwide Headquarters, Columbus, Georgia 31999. If the dispute cannot be resolved within said fifteen-day period, either party may file a written demand for arbitration with the other party. The party filing such demand shall simultaneously specify his, her or its arbitrator, giving the name, address and telephone number of said arbitrator. The party receiving such notice shall notify the party demanding the arbitration of his, her or its arbitrator, giving the name, address and telephone number of said arbitrator within five (5) days of the receipt of such demand. The arbitrator named by the respective parties need not be neutral. The Senior Judge of the Superior Court of Muscogee County, Georgia, on request by either party, shall appoint a neutral person to serve as the third arbitrator, and shall also appoint an arbitrator for any party failing or refusing to name his arbitrator within the time herein specified. The arbitrators thus constituted shall promptly meet, select a chairperson, fix the time and place of the hearing, and notify the parties. The majority of the panel shall render an award within ten (10) days of the completion of the hearing, and shall promptly transmit an executed copy of the award to the respective parties. Such an award shall be binding and conclusive upon the parties hereto, in the absence of fraud or corruption. Each party shall have the right to have the award made the judgment of a court of competent jurisdiction.

Associate _____

## PARAGRAPH SIXTEEN: Headings

The headings of this Agreement are for reference only, and shall not limit the language used in this contract.

AFL 2927

## PARAGRAPH SEVENTEEN: Completely Integrated Agreement

These seventeen (17) paragraphs, along with the Schedules of Commissions, and any supplement of any district sales coordinator, regional sales coordinator, or state sales coordinator, contain the entire and complete agreement between the parties, and each of the parties hereto agrees that there are no prior or contemporaneous agreements, promises or representations that are not set forth herein.

WITNESS the hand and seal of Associate and the execution by a duly authorized officer of AFLAC.

WITNESS: _____

BY: _____ (L.S.)
Associate's Signature

Date: 8/8/94

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
Social Security Number

Associate's Current Writing Number
(For Administrative Purposes Only)

0007757985
Associate's License Number

Licensed for: Life ✓    A&H ✓

BUSINESS ADDRESS:

345 Honey Dr.
Street & No. (REQUIRED)

Brownsville   TX.   78520
City        State        Zip Code

HOME ADDRESS (IF DIFFERENT):

_____

_____
P. O. Box No. (if any)

_____
City        State        Zip Code

(210) 546-9358
Associate's Telephone No.        (HOME)

(210) 982-0832
Associate's Telephone No.        (BUSINESS)

AMERICAN FAMILY LIFE ASSURANCE
COMPANY OF COLUMBUS (AFLAC)

BY: _____

TITLE: ASST. VICE-PRESIDENT

EFFECTIVE DATE: 9-6-94

FOR OFFICE USE ONLY
WORLDWIDE HEADQUARTERS

Associate's Mailing Address PLEASE PRINT

DINO X. CHAVEZ
                        Name
345 Honey Dr.
                        Street
Brownsville, TX. 78520
                        City/State/Zip

Form A-1351   DEPARTMENT
AGENT LICENSE

AUG 19 94

RECEIVED

6

AFL 2928

# American Family Life Assurance Company
## of Columbus (AFLAC)

Worldwide Headquarters: Columbus, Georgia 31999

## *Regional Sales Coordinator's Agreement*

**WHEREAS,** the undersigned is now an Associate with American Family Life Assurance Company of Columbus ("AFLAC") under an Associate's Agreement (the terms of which are incorporated in this Agreement by reference) and the parties hereby desire to execute this additional Agreement in order to set forth the terms and conditions of the respective covenants, duties, and obligations of the undersigned as Regional Sales Coordinator, hereafter "RC."

**NOW, THEREFORE,** AFLAC and the undersigned RC do hereby covenant and agree as follows:

### Paragraph One: APPOINTMENT

AFLAC appoints the undersigned as Regional Sales Coordinator to serve in the region or territory assigned to the RC in writing by AFLAC, and RC covenants to serve as RC in the said region or territory in accordance with the terms and conditions hereafter set forth.

### Paragraph Two: RELATIONSHIP

(a) **Independent Contractor.** The relationship of the RC to AFLAC shall be and shall continue to be that of an independent contractor rather than employer-employee, and nothing contained herein shall be construed as creating any other relationship.

(b) **Relationship of Others.** It is understood and agreed that associates assigned to the RC are independent contractors, and the district sales coordinator who may be assigned to the RC is an independent contractor, and the state sales coordinator to whom the RC is assigned may be an independent contractor in their relationships with AFLAC. The RC shall at all times respect that relationship in the performance of the RC's duties hereunder.

(c) **Expenses.** All expenses incurred by the RC shall be the sole responsibility of the RC. The RC has no authority to rent any office or telephone, open any bank account, or make any expenditures, obligation or commitment for any purpose in the name of AFLAC without specific written authorization from the president, a vice president, or secretary of AFLAC.

### Paragraph Three: DUTIES

The RC shall recruit and train associates for the sale of all AFLAC insurance policies and coordinate the activities of the associates and the district sales coordinators assigned to the RC in writing by AFLAC. For the purpose of maximizing the sales efforts of AFLAC, the RC should cooperate with the associates and district sales coordinators assigned to the RC, and the state sales coordinator to whom the RC is assigned.

### Paragraph Four: ASSIGNMENT

AFLAC may, in its sole and absolute discretion, assign and reassign associates and district sales coordinators to the RC. The RC shall be paid renewal override commissions on all AFLAC insurance policies that are sold by associates and district sales coordinators while assigned in writing to the RC. The RC understands and agrees that he or she may be assigned to a state sales coordinator for purposes of assisting the RC in training, recruiting and marketing. The RC may be reassigned to a different state sales coordinator at AFLAC's discretion.

### Paragraph Five: FIRST-YEAR AND RENEWAL OVERRIDE COMMISSIONS; RSC MPI PROGRAM

As full compensation for the performance of the RC's duties, the RC shall be paid first-year and renewal override commissions on sales of all AFLAC insurance policies made by the RC, and by district sales coordinators, and associates while assigned in writing to the RC.

(a) **First-Year Override Commissions.** First-year override commissions shall be advanced on sales credited to the RC. Said compensation shall be paid in accordance with each policy's Schedule of Commissions (at the RSC MPI Participant Rate) in effect at the time of the sale.

(b) **Renewal Override Commissions.** Renewal override commissions shall be credited to the RC in accordance with each policy's Schedule of Commissions (at the RSC MPI Participant Rate) in effect at the time of the sale.

(c) **Schedules of Commissions.** The official Schedule of Commissions for the applicable AFLAC insurance policies are incorporated herein by reference. The commission for situations that are non-standard or not contemplated by the

M-0806

**Exhibit No. 2**

M0806.1

001154

Schedule of Commission shall ... governed by AFLAC's then-current rules ... in accordance with AFLAC's ...n-current rules, rates and practices. RC ac...owledges and agrees that AFLAC, upon thirty (30) days written notice to RC, may change the Schedules of Commissions and conditions with respect to (a) any policies issued and in force on or after the date of the change, and (b) any policies issued before the date of the change but in force after such date if there has been a change in federal, state or other laws mandating an increase in loss ratios. When changes in the schedules are made, they are incorporated herein by reference and become a part of this Agreement.

(d) **MPI Bonus; Qualification.** RC may also qualify for and be paid an annual production bonus under and in accordance with the terms and conditions of the RSC MPI Program in effect at the time of the sale and his or her Regional Sales Coordinator's Agreement. The official RSC MPI Program for the applicable policies is incorporated herein by reference. Upon thirty (30) days written notice, AFLAC may change the terms and conditions of the RSC MPI Program with respect to any policies issued and in force on or after the date of the change.

## Paragraph Six: VESTING CONDITIONS

(a) **Prior to Termination.** During the term of this Agreement, first-year and renewal commissions shall be paid pursuant to Paragraph Five herein. No production or premium minimum is required as a condition for payment.

(b) **After Termination.** After termination of this Agreement, vesting of renewal commissions shall be paid in accordance with the conditions set forth in said Associate's Agreement.

## Paragraph Seven: AGREEMENT TO REAFFIRM

All of the provisions of the RC's Associate's Agreement with AFLAC shall continue to be of full force and effect, and shall govern this contract in all respects except as expressly modified herein. The RC hereby ratifies and reaffirms all the provisions of said Associate's Agreement with AFLAC as fully and effectually as though the provisions thereof were set forth herein verbatim.

## Paragraph Eight: SUBSTITUTION OF DISTRICT SALES COORDINATOR'S AGREEMENT

his RC's Agreement completely supersedes and replaces any existing District Sales Coordinator's Agreement between the parties. During the term of this RC's Agreement, no District Sales Coordinator's Agreement between the parties shall be valid unless specifically authorized in writing by the president, a vice president, or the secretary of AFLAC.

## Paragraph Nine: TERMINATION OF APPOINTMENT AS REGIONAL SALES COORDINATOR

This Agreement may be terminated without having any effect on said Associate's Agreement. Any such termination shall be subject to the termination conditions set forth in said Associate's Agreement. This expressed provision shall not affect the general governing provisions set forth in Paragraph Seven, above.

IN WITNESS WHEREOF, the parties have hereto affixed their respective signatures.

WITNESS: _____

BY: _____
RC Signature

11/12/98
Date

AMERICAN FAMILY LIFE ASSURANCE
COMPANY OF COLUMBUS (AFLAC)

APPROVED

BY: _Daisy W. Lee_____

TITLE: __2nd VICE-PRESIDENT_____

DATE: __11/19/98_____

**For Office Use Only**
**Worldwide Headquarters**

M-0806

M0806.1

001155

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DINO CHAVEZ, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. B-02-128 |
| | § | |
| BROWNSVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT AND NOE | § | |
| SAUCEDA, | § | |
| | § | |
| Defendants. | § | |

## ORDER

BE IT REMEMBERED, that on January 5, 2004, the Court considered Third party Defendant American Family Life Assurance Company of Columbus's ("AFLAC") Motion to Dismiss [Dkt. No. 47], Motions for Hearings [Dkt. Nos. 53 & 61], Motion to Strike, or in the Alternative to Stay Proceedings and Compel Arbitration [Dkt. Nos. 66-1, 66-2, & 66-3], Motion for Summary Judgment [Dkt. No. 67], Motion to Strike Defendant Brownsville Independent School District's ("BISD") and Defendant Noe Sauceda's Response to AFLAC's Motion for Summary Judgment [Dkt. No. 79], Motion to Modify Factual Statement [Dkt. No. 72], and the responses and replies thereto. The Court also considered Defendant Sauceda's Motion for Leave to File Third Amended Complaint [Dkt. No. 50]. For the reasons that follow, the Court **GRANTS** AFLAC's Motion for Summary Judgment, and **DENIES as moot** the remaining motions. Additionally, the Court **DENIES** Defendant Sauceda's Motion for Leave to File Third Amended Complaint [Dkt. No. 50].

### I. Factual and Procedural Background

This case was originally filed in the 404th Judicial District Court in Cameron County, Texas. Defendants removed the case to this court on July 17, 2002. Plaintiff, Dino Chavez, brought a claim against BISD and Noe Sauceda, the Superintendent of

1

**Exhibit No. 3**

BISD, under 42 U.S.C. § 1983 for the deprivation of his due process rights under the Fourteenth Amendment and his free speech rights under the First Amendment of the United States Constitution. Plaintiff alleged in his first amended original complaint that he was an insurance sales agent representing American Family Life Assurance Company of Columbus ("AFLAC"). Plaintiff submitted an AFLAC proposal to BISD's Insurance Committee for an optional section 125 Cafeteria Plan Services Contract. It is undisputed that Plaintiff is not an employee or independent contractor of BISD. Plaintiff claimed in his complaint that his bid was, in essence, a bid to provide enrollment services to BISD employees and to provide administrative services for the processing of the employees' insurance policies. Plaintiff would earn commissions from the AFLAC insurance policies he sold directly to the employees.

The present dispute arose when, after coordinating the employees' cafeteria plan enrollment from 1998 through 2001, Noe Sauceda notified Plaintiff and AFLAC that Plaintiff would no longer be allowed to present AFLAC's bid to the Insurance Committee. Mr. Sauceda sent a letter to AFLAC in which he explained that unless another representative agent from AFLAC replaced Plaintiff, AFLAC's proposal would not be reviewed by the Insurance Committee. Mr. Sauceda cited unprofessional and unethical conduct and "continuous inappropriate correspondence" as the reason for such removal. See Plaintiff's First Amended Complaint, at ¶ 12 [Dkt. No. 14]. Plaintiff alleged this action occurred after Mr. Sauceda attempted to award the contract to another bidder, and submitted false information, such as misquotes, to the Insurance Committee in an effort to sabotage AFLAC's bid. In particular, Plaintiff accused BISD of attempting to appoint an "agent of record" to provide ancillary insurance policies and products for BISD employees, and opined appointing an agent of record is illegal based on information obtained from the Texas Attorney General's website. Plaintiff spoke about this issue at several BISD Board Committee meetings.

Along with other proposals, AFLAC's bid for insurance services was placed on the Insurance Committee's agenda for the November 29, 2001, meeting. During this Insurance Committee meeting, AFLAC's proposal was accepted by a vote of the Committee. Plaintiff alleged that despite the fact that he had written the proposal and

2

had conducted previous insurance enrollment services for BISD employees, he was deprived of the opportunity to actually present the proposal at the meeting and was not allowed to begin enrollment after its acceptance. Plaintiff argued his due process rights under the Fourteenth Amendment were violated when he was deprived of the opportunity to fully participate in the bidding process. In addition, Plaintiff argued his constitutional right to free speech under the First Amendment was violated when he was refused the opportunity to present the proposal in retaliation for publicly admonishing BISD for what he believed to be the illegal use of an agent of record.

BISD argued in its motion to dismiss that Plaintiff failed to demonstrate that a recognized property right arose from the award of a bidding contract. See BISD's Motion to Dismiss, at p. 2 [Dkt. No. 15]. BISD asserted that because Plaintiff was allowed to participate in all BISD bidding procedures, his procedural due process rights were not violated and no such property right exists under Texas law. See id. at 3.

On January 14, 2003, the Court dismissed Plaintiff's due process claim against Defendants BISD and Noe Sauceda. The Court's order was based on a finding "that Plaintiff [had] not demonstrated that a property interest exists for insurance service providers who are neither employed by BISD nor bound by contract to BISD." Court's Jan. 14, 2003, Order, at p. 6. Soon thereafter, Plaintiff filed a motion for reconsideration of the Court's dismissal of his due process claims, which the Court denied [Dkt. No. 33].

## II. Summary Judgment Standard

Summary Judgment shall be granted if the record, taken as a whole, "together with affidavits, if any, show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Factual controversies, if any exist, are resolved in favor of the nonmoving party. See Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994). See also Hunt v. Cromartie, 526 U.S. 541, 552 (1999). The party making a summary judgment motion has the initial burden of informing the court of the basis for their motion and identifying those portions of the pleadings and discovery documents that demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323

3

(1986); <u>Colson v. Grohman</u>, 174 F.3d 498, 506 (5th Cir.1999). Although the party moving for summary judgment must "demonstrate the absence of a genuine issue of material fact," <u>Celotex Corp.</u>, 477 U.S. at 327, the party "need not negate the elements of the nonmovant's case." <u>Little</u>, 37 F.3d at 1075 (en banc) (citing <u>Celotex</u>, 477 U.S. at 323). If the moving party meets this burden, the nonmovant then must designate specific facts, beyond the pleadings, showing there is a genuine issue for trial to survive summary judgment. <u>See</u> Fed. R. Civ. P. 56(e). <u>See also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986); <u>Little</u>, 37 F.3d at 1071 (citing <u>Celotex</u>, 477 U.S. at 325). "Unsubstantiated assertions" will not adequately cast doubt on material facts at issue. <u>See</u> <u>Hopper v. Frank</u>, 16 F.3d 92 (5th Cir. 1994). Likewise, the nonmovant must present more than a mere "scintilla" of evidence. <u>See</u> <u>Davis v. Chevron U.S.A., Inc.</u>, 14 F.3d 1082 (5th Cir. 1994). Summary Judgment should be granted "when the nonmoving party fails to meet its burden to come forward with facts and law demonstrating a basis for recovery that would support a jury verdict." <u>Little</u>, 37 F.3d at 1071. The evidence must be viewed in the light most favorable to the nonmovant. <u>See</u> <u>Whelan v. Winchester Prod. Co.</u>, 319 F.3d 225, 228 (5th Cir. 2003); <u>Walker v. Thompson</u>, 214 F.3d 615, 624 (5th Cir. 2000).

### III. Undisputed Facts and Legal Arguments

The Court addresses AFLAC's Motion for Summary Judgment, which incorporates its motion to dismiss arguments. As AFLAC points out, after dismissal Plaintiff maintains only one claim against BISD: an infringement of his First Amendment right to free speech in violation of 42 U.S.C. § 1983. BISD was granted leave by this Court to file a third party petition against AFLAC, in which BISD sought contribution and/or indemnity from AFLAC in the event BISD is found liable under section 1983. BISD asserted in their third party complaint that "the damages of Plaintiff were proximately caused by the negligent conduct of [t]hird party Defendant AFLAC in wrongfully terminating AFLAC's contract with Dino Chavez." Third Party Petition, at p. 4 [Dkt. No. 28]. BISD now concedes that contribution is not recoverable under sections 1983 and 1988 for constitutional violations. <u>See, e.g.</u>, <u>Harris v. Angelina County, Texas</u>, 31 F.3d 331, 338 & n.9 (5th Cir. 1994) (noting that in light of Supreme Court

decisions holding there is no right to contribution under Title VII and the Equal Pay Act, most district courts have held there is no right to contribution under section 1983); Wright v. Reynolds, 703 F. Supp. 583, 591-92 (N.D. Tex. 1988) (determining there is no right to contribution or indemnity for civil rights violations under section 1983); Mason v. City of New York, 949 F. Supp. 1068, 1079 (S.D.N.Y. 1996) (holding there is no right to contribution under section 1983).

As mentioned in this Court's previous orders, it is undisputed that Plaintiff has never been employed by BISD. Furthermore, AFLAC has presented unrefuted evidence that Plaintiff first entered into an Associate's Agreement with AFLAC in 1994 when Plaintiff became an AFLAC agent. See AFLAC's Motion for Summary Judgment, at p. 5 & Ex. 2 [Dkt. No. 67]. In 1999, AFLAC promoted Plaintiff to the position of Regional Sales Coordinator, and the parties entered into a corresponding agreement, entitled the Regional Sales Coordinator's Agreement ("RSC Agreement"). See id. Ex. 2 and attached Ex. 11. AFLAC terminated Plaintiff's RSC Agreement in January 2002. Any remaining factual disputes are not material to this Court's determination of AFLAC's motion for summary judgment.

Defendant BISD argues in its Response to AFLAC's Motion for Summary Judgment that although there can be no claim for contribution against AFLAC, Plaintiff's damages for loss of earnings resulted when AFLAC, and not BISD, terminated his RSC Agreement and essentially demoted Plaintiff to his previous position of sales associate. See BISD's Response, at p. 5 [Dkt. No. 74].[1] Additionally, BISD references a "Notice of Clarification" filed on July 7, 2003, in which Plaintiff states that "[a]lthough [he] has not yet alleged or asserted a cause of action against AFLAC, he maintains a viable claim for violation of his equal rights under the law, for which he may still maintain an action pursuant to 42 U.S.C. § 1981(a)." Id. at p. 3 & Ex. A (Notice of Clarification, at p. 2). Additionally, Plaintiff asserts he "would show" AFLAC violated section 1981 "by

---

[1] The Court acknowledges that AFLAC has filed a Motion to Strike BISD's Response on the grounds that it was untimely filed. According to the Court's record, a response motion was due on or before October 15, 2003. BISD, however, filed its response on October 22, 2003, which makes the filing untimely. Nevertheless, in an effort to be thorough the Court briefly addresses BISD's response arguments.

5

restricting his ability to make and enforce contracts and by denying him the full and equal benefit of all laws and proceeds for the security of persons and property as is enjoyed by White citizens." Id. Furthermore, in this clarification, Plaintiff asserts that "the breach of contract by Third Party Defendant AFLAC was based in part on Plaintiff's race . . . [and] such actions caused or contributed to Plaintiff's damages herein." Id.

To date, Plaintiff has not filed a motion requesting leave to amend his complaint to include this new cause of action against AFLAC. Instead, Plaintiff raises a possible, but as yet unasserted, new theory of recovery against AFLAC under 42 U.S.C. § 1981(a). The "clarification" does not provide additional facts to support causes of action already asserted against AFLAC. Curiously, Plaintiff acknowledges that he has not filed a cause of action against AFLAC, yet files a clarification presumably with the hope of retaining AFLAC in this lawsuit. Because Plaintiff's "clarification" adds nothing to the live pleading, and instead only mentions a cause of action that has not actually been brought against AFLAC, the Court **STRIKES** this filing [Dkt. No. 60]. Had Plaintiff desired to bring such a claim, the proper course would have been to file a motion for leave to amend his complaint, which in turn would have provided AFLAC with an opportunity to file an answer to the amended complaint. The Court, therefore, **GRANTS** AFLAC's Motion to Strike the Notice of Clarification [Dkt. No. 66-1]. AFLAC's alternative requests to stay proceedings and compel arbitration are **DENIED as MOOT** [Dkt. Nos. 66-2, 66-3].

Plaintiff's only remaining claim against BISD is for a free speech violation of 42 U.S.C. § 1983. Therefore, BISD's argument that "Texas Rules of Civil Procedure [sic] § 33 applies to any cause of action based on tort in which a defendant, settling person, or responsible third party is found responsible for a percentage of the harm for which relied [sic] is sought" is unavailing because AFLAC is not alleged to have been a *joint tortfeasor.* See BISD's Response to AFLAC's Motion for Summary Judgment, at p. 5 [Dkt. No. 74]. See also Bonniwell v. Beech Aircraft Corp., 663 S.W.2d 816, 818 (Tex. 1984) ("Contribution is allowed in Texas only among joint tortfeasors"); Tex. Civ. Prac. & Rem. Code § 33.002(a) ("[T]his chapter applies to any cause of action based on tort in which a defendant, settling person, or responsible third party is found responsible for a

6

percentage of the harm for which relief is sought."). BISD, however, has not alleged that AFLAC is a joint tortfeasor, and thus responsible for a percentage of the harm for which Plaintiff seeks relief. Furthermore, "[s]ection 33.016(b) grants a right of contribution only to a 'liable defendant.' A liable defendant is a 'defendant against whom a judgment can be entered for at least a portion of the damages awarded to the claimant.'" Pacesetter Pools, Inc. v. Pierce Homes, Inc., 86 S.W.3d 827 (Tex. App. –Austin 2002, no pet.) (citations omitted). See also CBI NA-CON, Inc. v. UOP, Inc., 961 S.W.2d 336, 339 (Tex. App. –Houston [1st Dist. 1997], pet. den.) (stating the axiomatic notion that contribution is derivative in nature and any claim a defendant has against a third party is derivative of the claim a plaintiff could bring against the third party).

BISD cites Elson Thermoplastics v. Dynamic Systems, Inc. to support its argument that if there is a factual question as to a defendant's liability, then fact questions must also exist concerning the third party's liability. 49 S.W.3d 891, 901-902 (Tex. App. – Austin, 2001, no pet. h.). BISD argues its claim for contribution is not proper for determination on summary judgment because as long as factual issues remain on Plaintiff's claim, an award of contribution is possible. Elson Thermoplastics, however, also reiterated the basic premise that "[a] claim for contribution is derivative of the plaintiff's right to recover from a joint defendant against whom contribution is sought. In other words, [Defendant's] claim of contribution derives from [Plaintiff's] right to recover from [the third party]." Id. at p. 902. In the case before this Court, Plaintiff has alleged no claim against BISD for which AFLAC could share liability, and that would require contribution. BISD responds that "[a]s the contractor of Dino Chavez, AFLAC was solely in the position to cause damage to Plaintiff. AFLAC chose to demote Dino Chavez separate and apart from BISD and Dr. Sauceda and as such should remain a party to this suit." BISD's Response to AFLAC's Motion for Summary Judgment, at p. 6. This response misses the mark because Plaintiff still has not alleged a *tort* against BISD for which AFLAC could be considered a joint tortfeasor. Furthermore, there are no factual issues as to AFLAC's liability because Plaintiff has not lodged any allegations of tortious acts against BISD, nor has Plaintiff alleged any facts that would support

7

*tortious* conduct of AFLAC, rather than conduct concerning AFLAC's contractual obligations to Plaintiff under the RSC Agreement.[2]  See CBI NA-CON, Inc., 961 S.W.2d at 339-40 ("[w]hen the party claims only economic injury to the subject matter of the contract itself, the action sounds in contract and not tort" and "[w]hen a negligence claim is made alleging the breach of the very duties encompassed in a contract between the parties, the action is for breach of contract and not tort." ) (citations omitted).[3]

For the above reasons, the Court **GRANTS** AFLAC's Motion for Summary Judgment [Dkt. No. 67].[4]

## IV.  Defendant Noe Sauceda's Motion for Leave to File Third Party Complaint Against AFLAC

As AFLAC has pointed out, Sauceda's third party complaint against AFLAC is nearly identical to BISD's third party complaint.  Sauceda brings a claim "for contribution and/or indemnity since AFLAC was responsible for determining how and whether Plaintiff would suffer any economic damages as a result of Dr. Sauceda's letter requesting that he not interface with BISD because of his disruptive behavior."  Sauceda's Motion for Leave to File Third Party Complaint, at p. 2 [Dkt. No. 50].

---

[2]The Court is not commenting on AFLAC's contractual obligations or on the merits of a hypothetical contractual claim against AFLAC.  Rather, the Court simply distinguishes between any action arising from tortious conduct versus conduct arising from contractual obligations.

[3]BISD alleges in its Third party Petition that AFLAC was "negligent" in "wrongfully terminating AFLAC's contract with Dino Chavez."  See BISD's Third party Petition, ¶ 9 [Dkt. No. 28].  This conclusory allegation does not suffice to allege a claim for negligence, and the claim clearly sounds in breach of contract.

[4]It appears from BISD's response filings that it has abandoned its claim for indemnity against AFLAC.  Even if this is not the case, BISD has failed to state a claim for indemnification because it has alleged no facts indicating AFLAC is liable as a tortfeasor for the acts of BISD based on the relationship between the two parties.  See St. Anthony's Hosp. v. Whitfield, 946 S.W.2d 174, 177 (Tex. App. – Amarillo 1997, writ denied).  Under Texas law, indemnity is available in only limited circumstances: where the defendant's liability is purely vicarious or where an express or implied agreement exists between the parties.  See Hardy v. Gulf Oil Corp., 949 F.2d 826, 830-31 (5th Cir. 1992).  Finally, BISD has not alleged that indemnification exists under statute.  See Crane Crane Carrier Co. v. Bostrom Seating, Inc., 89 S.W.3d 153, 157-58 (Tex. App. –Corpus Christi 2002, no pet. h.).

The Court will not unnecessarily repeat the legal analysis it employed in granting AFLAC summary judgment against BISD. Sauceda, like BISD, agrees there is no right to contribution for section 1983 claims, and Sauceda concedes there are no other statutory or legal rights to indemnity. See Defendant Sauceda's Reply to AFLAC's Response to Sauceda's Motion for Leave to File Third Party Complaint Against AFLAC [Dkt. no. 56], at p. 2. Sauceda maintains, however, that a right to contribution remains for the tort claims Plaintiff asserts against him; namely Plaintiff alleges Sauceda tortiously interfered with Plaintiff's contract with AFLAC.

Sauceda's claim against AFLAC for contribution for tortious interference fails because AFLAC is not a joint tortfeasor, and indeed cannot interfere with its own contract. See, e.g., Bonniwell, 663 S.W.2d at 818; Holloway v. Skinner, 898 S.W.2d 793, 795 (Tex. 1995) (as a matter of law a party to a contract cannot tortiously interfere with its own contract). See also discussion infra, Part III. Furthermore, Sauceda has utterly failed to allege any claims or damages arising from tortious conduct, rather than contractual obligations.[5] See discussion infra, Part III.

Although leave to amend complaints and file third party petitions should be generously granted pursuant to Federal Rule of Civil Procedure 15(a), where such a filing or amendment would be futile, the Court may deny the motion to amend. See LeFall v. Dallas Independent School District, 28 F.3d 521, 524 (5th Cir. 1994). Sauceda has not stated a claim for contribution or indemnity against AFLAC, and thus filing a third party complaint would be futile as it would not withstand dismissal.

---

[5]To the extent that Sauceda argues he maintains a claim for contribution against AFLAC because but for AFLAC's termination of Plaintiff's RSC Agreement, Plaintiff would not have suffered any economic damages, these arguments fail. As explained in the body of this opinion, contribution is available in limited circumstances that involve joint tortfeasors. Although the Court will look to the kind of damages alleged to determine whether the claims sound in tort or contract, arguments solely addressing the proximate cause of the damages sustained negates the other requirements necessary to claim contribution.

9

## V. **Conclusion**

The Court makes the following rulings:

**GRANTS** AFLAC's Motion for Summary Judgement [Dkt. No. 67];

**DENIES AS MOOT** AFLAC's Motion to Dismiss [Dkt. No. 47];

**DENIES AS MOOT** AFLAC's Motions for Hearings [Dkt. Nos. 53 & 61];

**GRANTS** AFLAC's Motion to Strike [Dkt. No. 66-1];

**DENIES AS MOOT** AFLAC's Alternative Motion to Stay Proceedings [Dkt. No. 66-2];

**DENIES AS MOOT** AFLAC's Alternative Motion to Compel Arbitration [Dkt. No. 66-3];

**DENIES AS MOOT** AFLAC's Motion to Strike Defendant BISD's and Defendant Sauceda's Response to AFLAC's Motion for Summary Judgment [Dkt. No. 79];

**DENIES AS MOOT** Motion to Modify Factual Statement [Dkt. No. 72];[6]

**DENIES AS MOOT** AFLAC's Motion In Limine [Dkt. No. 87]; and

**DENIES** Defendant Sauceda's Motion for Leave to File Third Amended Complaint [Dkt. No. 50].

DONE at Brownsville, Texas, this 5th day of January, 2004.

Hilda G. Tagle
United States District Judge

---

[6] AFLAC filed a Motion to Correct Factual Statements in Order Dated September 30, 2003 [Dkt. No. 72]. In its motion, AFLAC requested that the Court clarify two statements regarding Plaintiff's employment status with AFLAC and BISD. Although the Court now moots this motion, it would not be inclined to grant the motion were AFLAC still a party to this law suit. First, because the Court's statements were contained in a motion for reconsideration, these statements simply related to the Court's earlier due process analysis when it first considered Defendants' motion to dismiss. Second, the Court's statements were made in the course of its rulings on Defendants' motion to dismiss, and therefore, the district court must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff. Baker v. Putnal, 75 F.3d 190, 196 (5th Cir. 1996). In fact, it later became clear based on Plaintiff's Motion for Reconsideration that Plaintiff had not clearly represented to the Court his employment relationship with AFLAC. The Court's statements were not material to its ruling, nor were the statements factual findings that would otherwise preclude the parties' from disputing the nature of such an "employment" relationship.

10

# LOCKE LIDDELL & SAPP LLP

### ATTORNEYS & COUNSELORS

100 CONGRESS AVENUE
SUITE 300
AUSTIN, TEXAS 78701-4042

AUSTIN • DALLAS • HOUSTON • NEW ORLEANS

(512) 305-4700
FAX: (512) 305-4800
www.lockeliddell.com

April 15, 2004

Mr. J. Arnold Aguilar
1200 Central Blvd.
Artemis Square, Suite H-2
Brownsville, TX 78520

*Via facsimile and U.S. Mail*

Re:   C. A. No. B-04-042; *Dino X. Chavez v. AFLAC*; In the U. S. District Court, Southern District, Brownsville Division

Dear Arnold:

I am in receipt of your letter of April 13, 2004, in which you suggest taking depositions before responding to our settlement offer. Clearly, you are entitled to gather information informally to the extent you think necessary to respond to our offer. AFLAC, however, does not believe depositions are necessary for purposes of settlement negotiations, nor is it inclined to expend attorneys fees, time, and resources in attending depositions that appear to be nothing more than a fishing expedition by you in hopes of finding some evidence to support what appears to be a baseless Section 1981 claim. If your intent is to threaten an escalation of expenses in hopes of extracting a better settlement, it is misplaced.

In the past, you have acknowledged that the claims asserted by Mr. Chavez in this suit are subject to the parties' arbitration agreement. AFLAC intends to proceed with arbitration, because it appears that the chances for a reasonably prompt settlement are gone. Therefore, please be advised that AFLAC hereby demands that the parties proceed with arbitration and designates Joseph L. Waldrep as its arbitrator, in accordance with Paragraph 15 of the Associates Agreement signed by Mr. Chavez on August 8, 1994. Mr. Waldrep's address is c/o Hatcher, Stubbs, Land, Hollis & Rothschild, 233 12th Street, Suite 500, Columbus, GA 31901-2468, and his phone number is 706-324-0201. Kindly advise me of Mr. Chavez's choice of arbitrator within five days, as required by the parties' agreement. Also be advised that AFLAC will ask the Senior Judge of the Superior Court of Muscogee County, Georgia to appoint a neutral person to serve as a third arbitrator in this dispute, as per the parties' agreement. AFLAC is willing to arbitrate this dispute at a convenient location in Texas.

As to proceeding with depositions, AFLAC will oppose any depositions you may notice and will move to quash them for at least two reasons. First, this dispute is subject to arbitration, and any discovery must be conducted in accordance with discovery allowed in the arbitration proceeding. Secondly, AFLAC intends to move for summary disposition of Mr. Chavez's claims based upon AFLAC's affirmative defense of limitations. We will ask the arbitrators to postpone any discovery until after AFLAC's dispositive motion is considered. Obviously, if Mr. Chavez's claims are barred, there is no need for any discovery. It would be a waste of everyone's time and

*Writer's Direct Dial No.: 512-305-4734*          **Exhibit No. 4**          *Writer's e-mail: wsteele@lockeliddell.com*

Mr. J. Arnold Aguilar
April 15, 2004
Page 2

resources to begin discovery before the dispositive motion is considered.   Accordingly, I urge
you to refrain from noticing depositions and thereby cause us to expend time and effort to quash
them.  We will seek recovery of our attorneys fees should you proceed with noticing depositions.

I look forward to hearing from you regarding the name, address and telephone number of
Mr. Chavez's arbitrator.

Very truly yours,

William B. Steele III

WBS/glp

cc:    Mr. Jeff Willis

04055:00005:AUSTIN:291807.2

LAW OFFICE
# J. ARNOLD AGUILAR

J. ARNOLD AGUILAR
Board Certified - Personal Injury Trial Law
Texas Board of Legal Specialization

Board Certified - Civil Trial Law Advocate
National Board of Trial Advocacy

April 19, 2004

(956) 504-1100
Fax: (956) 504-1408
e-mail:aguilarlaw@aol.com

*via FACSIMILE (512) 305-4800*
Mr. William B. Steele, III
LOCKE, LIDDELL & SAPP, L.L.P.
100 Congress Avenue, Suite 300
Austin, TX  78701

Re:   Civil Action No. B-04-042
      Dino X. Chavez vs. AFLAC
      USDC - Brownsville Division
      Our File No. 305-03

Dear Buddy:

I received your letter of April 15, 2004, and let me allay any concerns you may have regarding my desire to take depositions prior to responding to your offer.  I only anticipate taking one or two depositions before I can respond to your offer, and I assure you I have no desire to engage in a fishing expedition.  I believe the amount of your offer reflects your opinion of my client's case, and I simply need to take one or two depositions to confirm whether or not I can agree with your evaluation.  As we discovered through Mr. Barnson's deposition, I believe it is clear that Mr. Chavez's §1981 claim has merit, even if you may disagree about that evaluation.

As for your reference to the arbitration agreement, what I mentioned in the past was that if we can agree on an arbitrator that would be truly neutral and would understand our claims, we would likely be willing to submit to arbitration to resolve this action.  We have not yet agreed to do so, however.  As I mentioned before, I do not believe your suggestion of Mr. Pryor from Dallas reflected a good choice, particularly since he was such a good friend of your sister.  It was for that reason that I suggested we look for someone half way between my office in Brownsville and your office in Austin, perhaps in San Antonio or Corpus Christi.  We still do not believe that your arbitration agreement is valid, particularly since Mr. Chavez was not fully notified of any waiver of his right to a jury trial and the consequences of that decision for AFLAC's potentially egregious acts, and we intend to proceed with trial in Federal District Court in Brownsville.  Without waiving Mr. Chavez's right to proceed in Federal District Court in Brownsville, however, and to the extent of any subsequent determination that you have

**Exhibit No. 5**